IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMANDA OSMUN,

        Plaintiff,

    v.

COUNTY OF LEHIGH,

        Defendant.

CIVIL ACTION
NO. 25-1955

## MEMORANDUM OPINION

**Henry, J.**                                                         **April 28, 2026**

Plaintiff, Amanda Osmun ("Osmun"), brings this suit against her former

employer, the County of Lehigh ("County"), under the Americans with Disabilities Act

("ADA") and the Pennsylvania Human Relations Act ("PHRA") for alleged

discrimination. Osmun alleges that she was erroneously regarded by the County as

having a disability in the form of severe mental illness and that she was terminated due to

this misperception. Before the Court is the Motion for Summary Judgment of the County,

Osmun's opposition to the motion, and the County's reply. For the reasons that follow, I

will grant the County's motion.

## I.    FACTUAL BACKGROUND

Osmun was hired by the County and began working as a Caseworker II in the

Office of Children and Youth Services ("CYS") on December 18, 2018. ECF No. 26-1,

Ex. A, Osmun's Enrollment Forms. Shortly after beginning her employment with the

County, Osmun informed them that she suffered from an anxiety condition. ECF No. 1,

Complaint ("Compl.") at ¶¶ 8-9. Osmun began working in the General Protection

Services – Intake and Assessment Unit within CYS, and sometime in 2021, she transferred within CYS to the Adoption and Independent Living Unit. ECF 27, Osmun Dep. Transcript ("Osmun Dep."), pp. 16-18. As part of the Adoption and Independent Living Unit, Osmun assisted with the finalization of adoptions for children whose natural parental rights had been terminated. *Id*. at 18.

When she began her employment with the County, Osmun received a copy of its Personnel Policies & Procedures Manual, acknowledged that she received it, and assumed responsibility for reading, understanding and following the policies and procedures it contained. ECF 26-1, Ex. E, Acknowledgment Form. The Manual provides, in relevant part, that "[e]mployees of the County . . . shall not . . . [m]isuse privileged information or reveal confidential data to others." ECF 26-1, Ex. D, Personnel Policies & Procedures Manual ("Manual"), p. 4-2. The Manual also addresses employee discipline and lists offenses that subject an employee to immediate dismissal, including "[d]iscussing or disclosing confidential information to a third party." *Id*. at 5.1.

When she began her employment with the County, Osmun also received and executed a "Confidentiality Statement" which stated that she understood that "all confidential client-related information disclosed to or acquired by [her] during the course of [her] employment with DHS must be kept in the strictest of confidences," and that "any employee who . . . releases . . . confidential client-related information . . . is subject to discipline up to and including termination." ECF 26-1, Ex. G, Dept. of Human Services Confidentiality Statement.

Osmun's employment with the County was uneventful until February of 2024 when she was passed over for promotion to a supervisor position. Compl., ¶¶ 10-12. On

February 7, 2024, Osmun had a meeting with her manager, Sharon Dunn, where Dunn informed Osmun that that she had not received the sought-after promotion. Compl., ¶12. Osmun claims that at this meeting, she asked Dunn for feedback, and that Dunn only wanted to discuss Osmun's mental health and confidence, and not her professional development. *Id*. at ¶¶ 13-14; Osmun Dep., pp. 31-35. Osmun became upset while in Dunn's office and began crying and hyperventilating, causing Dunn to ask if Osmun needed her to call crisis intervention to assist Osmun. Osmun Dep., pp. 49-51; ECF 29, Ex. I, Dunn Dep. Transcript ("Dunn Dep."), pp. 22-24.

Then, on March 1, 2024, Osmun had a meeting with Dunn, Heather Reed, Director of the Office of Children and Youth Services, and Crisis Intervention Director Lisa Cozzi to discuss concerns over Osmun's reaction to Dunn's recent denial of Osmun's request for overtime and whether Osmun could keep up with her workload. Osmun Dep., pp. 59-61; Dunn Dep., pp. 33-34; ECF No. 27-1, Ex. F, Heather Reed Dep. Transcript ("Reed Dep."), p. 17. The parties agree that at this March 1, 2024, meeting, Osmun was again upset and displaying signs of stress, and that she ultimately took a few days off work. ECF 26-1, Ex. J, Reed Letter to Osmun referencing the visible stress that she was experiencing on March 1; Osmun Dep., pp. 61, 67-68; Dunn Dep., pp. 39-41; Reed Dep., p. 28. The parties disagree, however, on the reason for Osmun's subsequent time off. Osmun claims that she was required to take time off for a mental health break because she was afraid the County would terminate her, claiming that she was a danger to herself or to others if she did not, Compl., ¶¶ 25, 34, while the County claims that she voluntarily decided to take a few days off.

On August 23, 2024, Osmun received a written disciplinary notice after a hearing was held on August 13, 2024, at which she was found to have violated County policies. Dunn Dep., p. 48; Osmun Dep., p. 94; Compl., ¶¶ 49-51. This discipline was based upon Osmun's working overtime without supervisory approval and sending emails to third party providers that the County considered unprofessional and inappropriate. Osmun Dep., pp. 71, 74-81, 89; Dunn Dep., pp. 47-48.

A week later, on August 30, 2024, Osmun was informed by her new supervisor, Matthew Neveling, that she would be required to copy him on all email correspondence going forward, and she experienced a panic attack during this meeting with Neveling. ECF 27-2, Ex. K, Neveling Dep. Transcript ("Neveling Dep."), pp. 34-35, 37; Dunn Dep., pp. 38-39. Osmun began to hyperventilate, was having trouble breathing, was crying, rocking back and forth in her chair and hitting her head on the wall of Neveling's cubicle. Neveling Dep., pp. 37, 41; Osmun Dep., pp. 95-97. A representative of crisis intervention responded to Osmun's panic attack, although Neveling testified that he did not call crisis intervention. Neveling Dep., pp. 41-42.

Although it is not an exhibit, Osmun's Complaint states that she then received a letter from the County on September 3, 2024, informing her that she would be suspended beginning on September 4, 2024, to allow the County to conduct an investigation. Compl., ¶57. The letter did not specify the subject of the investigation, and there is some disagreement as to its subject matter. Reed testified that the investigation that was being undertaken involved "two incidents" pertaining to Osmun that occurred on August 30, 2024. Reed Dep., pp. 42-44. Also on September 3, 2024, Osmun met with Reed, Dunn and HR Director Brett Bowman to discuss her suspension, and Bowman testified that the

4

suspension was due to Osmun's failure to give a statement about the August 30, 2024, incident after being requested to do so. ECF 29-1, Ex. Q, Brent Bowman Dep. Transcript ("Bowman Dep."), pp. 29-30.

Meanwhile, on August 26, 2024 (before the panic attack in Neveling's office), Osmun had drafted a subsidy request letter on behalf of perspective adoptive parents seeking to adopt a child on Osmun's CYS caseload. ECF 27-3, Ex. L, Subsidy Letter. A subsidy request letter is a letter from an adoptive family to the County requesting ongoing subsidies for a child the family intends to adopt based on the child's needs. Neveling Dep.,pp. 73-75; Osmun Dep., p. 119. Neveling, Reed and Dunn all testified that CYS caseworkers should not draft subsidy request letters, as it would be a conflict of interest for them to do so. *See* Neveling Dep.,pp. 55-56, 71-73; Reed Dep., p. 62; Dunn Dep., pp. 79-81, 83. In fact, these same individuals testified that CYS caseworkers are trained that they are to have no involvement in the drafting of the subsidy request letters. Neveling Dep., pp. 55-56, 72; Reed Dep., p. 62; Dunn Dep., p. 81. Osmun does not dispute that she drafted the subsidy request letter at issue. Osmun Dep., p. 120. The subsidy request letter at issue here was problematic because it contained specific confidential information including the identity of the child's biological parents, Child Protective Services referrals that were determined to be unfounded, information regarding the biological mother's drug use, outcomes of CYS investigations and references to and dates of Child Protective Services and General Protective Services referrals and reports.[1] *See* Subsidy Letter; Reed Dep., pp. 62-64; Neveling Dep., pp. 63, 72-75; Dunn Dep., pp. 82-84.

---

[1] Osmun repeatedly argues that the County stated that the issue with the subsidy request letter that she drafted was the fact that it revealed the sources of the information contained therein, but the evidence of record does not support this allegation. The evidence shows that the County was clearly concerned with the content of the letter well beyond the sources of the information contained therein.

Through Heather Reed, the County became aware of this problematic subsidy request letter on September 3, 2024, (the same day as Osmun's unrelated suspension letter) and proceeded to investigate to determine who had prepared the letter.[2] See ECF 26-1, Ex. N, Sept. 3, 2024, Text to H. Reed; Reed Dep., pp. 33-34. After learning it was Osmun who had drafted the Subsidy Letter, the County sent Osmun a letter on September 5, 2024, informing her of her infractions, held a hearing on the matter, then chose to terminate her. See ECF 26-1, Ex. O, Sept. 5, 2024, Letter; ECF 26-1, Ex. P, Sept. 10, 2024, Termination Letter; ECF 26-1, Ex. C, Employee Separation Notice. According to the County, the confidential disclosures made by Osmun in the Subsidy Letter were the sole reason for her termination. See Sept. 10, 2024, Termination Letter; Employee Separation Notice; Reed Dep., p. 61; Dunn Dep., pp. 84-85; Bowman Dep., pp. 43-44.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. Proc. 56(a).  "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[2] There is no dispute that Reed was unaware of the existence of the Subsidy Letter at the time of Osmun's suspension on September 3, 2024.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (*citing Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). "[I]nstead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

## IV.    ANALYSIS

Osmun's Complaint contains causes of action for disparate treatment discrimination under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act.[3] The ADA forbids covered employers from discriminating against disabled individuals, and an employer can discriminate under the ADA in two different ways: "(1) if the employer takes adverse action against a qualified individual with a disability and that decision was motivated by the individual's actual disability or the employer's belief that the individual had a disability (i.e. disparate treatment); or (2) if the employer fails to make reasonable accommodations for that individual." *Fuoco v.*

---

[3] The Third Circuit has recognized that the ADA and the PHRA are "basically the same" and Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002). Therefore, my resolution of Osmun's ADA claim also disposes of her PHRA claim.

*Lehigh Univ.*, 981 F.Supp.2d 352, 361 (E.D. Pa. 2013). In the instant matter, Osmun brings only a disparate treatment claim.

Disparate treatment claims are subject to the *McDonnell Douglas* burden-shifting framework, *see Han v. Temple University*, 807 F.Supp.3d 442, 455 (E.D. Pa. Oct. 1, 2025), so to prevail on her claim, Osmun must first establish a *prima facie* case of discrimination under the ADA. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). If she can do so, then the burden shifts to the County to articulate a legitimate, non-discriminatory reason for Osmun's termination. See *id.* If the County meets that burden, then the burden shifts back to Osmun to establish that the County's explanation was a mere pretext for discrimination. *Id.*

To establish a *prima facie* case of disparate treatment under the ADA, Osmun must show: "(1) she is a disabled person within the meaning of the [ADA]; (2) she is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination." *Thimons v. PNC Bank, N.A.*, 254 Fed. App'x 896, 897 (3d Cir. 2007). Here, the County does not contest the first and second elements of the *prima facie* case. Rather, the County argues only that Osmun is unable to establish that her termination was a result of discrimination and therefore she cannot meet the third element.

To meet the third element of the *prima facie* case, Osmun "must show that her perceived disability was a 'determinative factor' in the defendant's decision to terminate her employment." *Garrow v. Wells Fargo Bank, N.A.*, No. 15-1468, 2016 WL 5870858, at *8 (E.D. Pa. Oct. 7, 2016) (quoting *Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207,

214-215 (3d Cir. 2000)). See also *Mengal v. Reading Eagle Co.*, No. 11-6151, 2013 WL 1285477, *4 (E.D. Pa. Mar. 29, 2013) (stating that "[a]t the summary judgment stage, an ADA plaintiff must provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action.")

Close temporal proximity between the date an employer learned of a plaintiff's disability and the date of her termination can create an inference of discrimination that satisfies this causation element. "Courts measure temporal proximity from the first date on which the litigant engaged in his protected activity." *Capps v. Mondelez Glob. LLC*, 147 F.Supp.3d 327, 337 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017). Here, Osmun can establish causation if she can "adduce evidence of a temporal proximity between the [County]'s knowledge of [her] disability and the adverse employment action." *Goodwin v. Univ. of Pennsylvania*, No. 21-755, 2023 WL 8027306, at *16 (E.D. Pa. Nov. 20, 2023), *aff'd*, 2024 WL 4678877 (3d Cir. Nov. 5, 2024). In terms of temporal proximity, two months or longer between the employer learning of the employee's disability and the adverse employment action has been found to be too long to support a *prima facie* case of disability discrimination. *Id.* (citing *Hollingsworth v. R. Home Prop. Mgmt., LLC*, 498 F.Supp.3d 590, 603 (E.D. Pa. 2020)). *Cf. White v. Presbyterian Medical Ctr. of Univ. of Penn. Health Sys.*, No. 20-6362, 2022 WL 3213532, at *10 (E.D. Pa. Aug. 8, 2022) (finding that less than three months between plaintiff informing her employer of her depression and the termination of her employment was sufficient to infer "unduly suggestive timing" to establish the third prong of the *prima facie* case).

After considering the record evidence, I find that Osmun has failed to create genuine issues of triable fact that her perceived mental disability was the cause of her

9

termination. First, all the credible evidence of record shows that Osmun prepared the subsidy request letter and included confidential information, thereby disclosing said confidential information to third parties. Osmun admitted to this disclosure, was aware that disclosure of confidential information was a violation of County policies and was terminated due to said violation. *See* Sept. 10, 2024, letter informing Osmun of her termination; Employee Separation Notice; Osmun Dep., p. 120; Reed Dep., p. 61; Dunn Dep., pp. 84-85; Bowman Dep., pp. 43-44. There is absolutely no reliable evidence that her termination was linked in any way to her perceived disability.

In an attempt to create an issue of fact, Osmun argues that she was perceived as having a mental disability by the County and was terminated due to that perception. As evidence of that alleged perception, Osmun points to the February 7, 2024, meeting with Dunn where she cried and hyperventilated and Dunn asked if she needed to call crisis intervention, the March 1, 2024, meeting with Dunn, Reed and Cozzi, where Osmun alleges they asked about her "mental stability" and allegedly tried to force her to take PTO, ECF 32-1, Osmun's Statement of Add'l Mat'l Facts, ¶ 2; Compl., ¶ 24, and the August 30, 2024, panic attack in Neveling's office for which Osmun was given a suspension letter dated September 3, 2024, and crisis management intervened.

Although all of these incidents occurred in the months prior to Osmun's termination, none meet the standard necessary to suggest temporal proximity to establish causation. Osmun admits that she first informed the County of her anxiety condition in 2018, shortly after she began working there, Compl, ¶¶ 8-9, 61; Osmun Dep., pp. 36-37, and her employment was terminated by the County in 2024, six years later. As discussed above, temporal proximity for purposes of causation in a disability discrimination matter

10

examines the time between the date an employer learned of an employee's disability and the date of an adverse employment action. In Osmun's case, six years had passed between those two events, which is clearly too long to support a *prima facie* case of discrimination.[4] The passage of six years between the two relevant events does not permit me to infer that the County terminated Osmun because of her perceived disability and she cannot satisfy the third prong of the *prima facie* test for disability discrimination under the ADA. Accordingly, her ADA claim must fail.

Even assuming, *arguendo*, that Osmun could establish a *prima facie* case of disability discrimination, her claim still would fail. At the second step of the *McDonnell Douglas* framework, the County must "articulate some legitimate, non-discriminatory reason" for the adverse employment action. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). Clearly the County has overwhelmingly done that here, as the record is replete with evidence establishing Osmun was terminated due to her disclosure of confidential information, as discussed above. Therefore, the burden under *McDonnell Douglas* shifts back to Osmun to prove that the County's claimed reasons for terminating her were pretext for discrimination.

---

[4] Osmun argues that "temporal proximity is not calculated between the first instance of knowledge of a disability (or protected activity) but instead the most recent instance of hostility (or protected activity)." ECF 32, Pl's Brief in Opposition, p. 10. In support of this proposition, she cites to seven out of circuit cases. However, I find these cases to be unpersuasive, not only because none of them are from this circuit, but because they are all cases addressing the temporal proximity necessary to establish a *prima facie* case of <u>retaliation</u>, not <u>disability discrimination</u>. The analysis of temporal proximity required in retaliation cases is different than that required in disability discrimination cases, as retaliation hinges more on the employer's immediate punishment of a protected activity, such as filing a complaint, while discrimination cases look more at the employer's motivation for the punishment and have a lower reliance on timing. Accordingly, I will continue to rely on the caselaw from this circuit holding that in the context of disability discrimination, temporal proximity for purposes of causation examines the date an employer first learned of an employee's disability and the date of an adverse employment action.

To prove pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Osmun has produced no evidence at all to establish that her perceived disability played a role in the County's decision to terminate her. Osmun violated County policies regarding disclosure of confidential information and was subsequently terminated, as permitted by County procedures. No County employees testified that her disability played even a minor role in the decision to terminate her. Rather, the decision properly focused on her violation of County policy, and no discrimination was present.

III.    **CONCLUSION**

For the reasons set forth above, the County's Motion for Summary Judgment is granted and this case is dismissed. An appropriate order follows.